Two from District Courts, one from the Patent Office, PTAB, and one from the CIT, Court of International Trade. Our first case is Unified Messaging v. Google et al., 2014-16-11. Mr. Greenspoon. Thank you, Judge Lurie. Good morning, Your Honors, and may it please the Court. Under either side's case law in this case, without lexicography or a disavowal, one cannot limit the plain meaning of a claim term to features of the preferred embodiment. But that's what the District Court did in this case with message, a communication between a sender and a recipient. But the case here is even stronger for reversal on message in particular, and that's because there are usages of the term message within the intrinsic record that are just not consistent with the limitations imposed by the District Court, the meanings imposed by the District Court. So first, I'll turn attention to notification message. That's something in the intrinsic record. It's a message. And I think nobody in this case disputes that those can come in over the Internet, which is otherwise excluded by the District Court, and those are emails, another sense excluded from the term message by the District Court. Second, even if we were to focus just microscopically on incoming messages into the preferred embodiment's MSDS-10, incoming messages, because we're asked to focus just on those, we have yet further examples. We have an incoming message that's an email. That's at column 23, lines 2 to 5. I'm going to refer to the 074 patent. I believe that citation is... Yeah. Column 23, that was new matter that was later added. That particular verbiage, yes, Your Honor, was added. There were a couple columns of, or more than a couple columns of new material, but new matter added. That may be new matter in the sense of the words were not there, but it's not new matter in the sense of disclosure that was not already available. For example... I guess I was wondering if that column 23 reference is really a red herring, because it feels so aberrational compared to maybe a couple dozen other references to this very repetitive troika of types of messages, right? I understand... Phone messages, fax messages, data messages. Then finally, there's this one place where it says email messages, phone messages, fax messages, but then if you look at all the context before and after that quick reference, it goes back to the repeating troika of types of messages. I guess what I'm trying to figure out is to what extent should I give some intentionality there to the reference to email when you look at the other 20-some-odd columns of the spec? Well, first to answer the question, Your Honor, it's not the only place where there's something called an email message. I would point, Your Honor, to column 3, lines 4 to 5. I believe column 4, line 40, those are also examples. Yeah, the column 3, that's talking about the prior art. That is indeed the background prior art. And then in column 4, it seems to make a distinction between email messages and data messages, right? I believe, Your Honor, it's more an emphasis than a distinction. Data messages were known in the art, and we have proof of this, were known in the art to include electronic mail messages. There is extrinsic evidence that we point to to show that. But then the data messages being discussed in column 4 talk about a dedicated data line, talk about data messages, like the phone line has to be set up to receive either a phone call or a fax or a data message. And so that made me wonder, okay, are we talking about a particular kind of data message, the kind that comes over a phone line that is somehow the equivalent of a fax message or a phone call? So let me answer the question, and then I'll expand back to my argument because I think this is a good segue. The dedicated data line in column 4 actually proves our point on the other aspect of the claim construction because it's not necessarily a telephone line. The verbiage is dedicated data line, which means that a person of skill in the art approaching the intrinsic record knows that one can have a dedicated data line bring in data messages. We also, as I mentioned a moment ago, confirmed that data message was known in the art as including electronic mail messages. So underscoring all of this, let's go back. Remember, our exercise here today is to determine what does the term message mean to one of ordinary skill in the art? What is its plain meaning, and is there any lexicography or disavowal? That's right, after reading this entire patent. Correct. And so what I'm trying to figure out here is when this patent issued or filed 20 years ago, after reading this patent and understanding what this person invented and what they're trying to accomplish and what they ultimately claimed, they would see that the inventor was trying to solve a problem where if the person was away from the office and was receiving a phone call or a fax message or something called a data message that the person couldn't get access to because they weren't in the office and they needed to be in the office, then this is some kind of system where you set up a server that can somehow get those messages and then email the person wherever they may be. They may be at home, they may be on vacation, and then they can get a notification that such a message arrived and then they can access the server from wherever they are. And so it feels illogical to say that if this system were to include emails, incoming emails, that you would have a system set up to send a notification email to let the person know that they received an email. That's not really what the written description is describing and it doesn't really make sense to me why someone would create a system like that or at least when you read this patent, it doesn't appear that that was being contemplated at all. Your Honor did correctly identify some problems being solved by the preferred environment in the claimed invention. That's absolutely right. But what Your Honor perhaps has overlooked in the statements that you just made is that the use of email into a central secure server where you have authenticated login and then the sending out of email of a notification message that one has come in itself circumvents the problems identified in the background of the invention. So we also see, I mean this is perhaps not intrinsic evidence, but I think it's a valid point that it's not nonsensical to have email into a central machine and then a notification email out. That's in fact what the entire infringement case is about. So the very fact there's an infringement case means it can't be considered nonsensical to have a system like that. But if I can point to one more area of the intrinsic record that addresses some of your concerns, Judge Shemp, it's that column 26, line 66 through column 27, line 5, shows messages coming into the MSDS over the Internet. The word Internet is actually in these passages. So this is something that the intrinsic record calls a message and it comes into the MSDS over something that's not just a telescope. This is the translation system or feature? That's right. There has been an intermediary, in this embodiment as described, there has been an intermediary action where initially the message comes in over a telephone line. I don't dispute that as a description of the preferred embodiment. But again, we're searching for the meaning of the word message in the intrinsic record. And the sense of the word message includes explicitly things that can come into the preferred embodiment's MSDS 10 over the Internet. So the fact that there was a translation as an intermediary activity in the preferred embodiment doesn't deprive this of the significance of being intrinsic evidence in conflict with the district court's exclusion of Internet or requirement, rather, of telephone line. Sort of curious, you've got a lot of claims here, 28 claims, and you don't have anything specific to e-mails. If e-mails were contemplated. There are e-mails described as, I think, independent claims with regard to notification messages. But I would grant, Your Honor, there's nothing in a dependent claim that explicitly claims e-mail as the incoming message. But I don't think that's the test, Your Honor. I mean, again, the test is plain meaning, and then we ascertain if there was a lexicography or a disclaimer. We looked at the specification, too. We looked at the specification. In the prosecution history, which I haven't yet spoken about, but in the prosecution history, e-mail was explicitly noted and agreed to by the examiner as something within the scope of an incoming message into the system. The examiner even applied prior art e-mail against the claims in that aspect, essentially with the patentee's consent, with the applicant's consent, because every party in the prosecution history understood that e-mail that comes in over the Internet into the preferred embodiments, MSDS, can qualify as a quote-unquote message. And, Your Honors, we would ask that the Court reverse on all three areas where we pointed to claim construction errors, as well as to vacate or reverse the Section 285 Partial Fee Award. I'd like to reserve the rest of my time for rebuttal, please. Thank you. Unless there are any further questions. Mr. Tchaikovsky. Good morning, Your Honors. Yar Tchaikovsky on behalf of Yahoo! Twitter, and I'll also be arguing on behalf of all of Appalachian Cross Appellants this morning. We just heard from counsel that there was nothing limiting with respect to these disclosures. If we follow this Court's case law that has existed post-Phillips, we see an abundant number of cases, whether that be more recently Trustees of Columbia, GP&E, IV versus Capital One, Ruckus Wireless, that all use the specification to interpret the claims as they should post-Phillips, and even cases cited by counsel in their briefing, Thorner and Unwired Planet, can be explained and are in concert with Phillips and its decision. The fact that there can be explicit disclaimers or disavowals doesn't change the ultimate result. What we have here is an integrated document that must be read in context, and when you read that integrated document in each of its columns with the claims, there is only one conclusion, and that one conclusion is we have a system that has messages that are inbound, different than notification messages. There is a species of communications or messages that are greater, but we have effectively, sorry, there's a generic communication. We have species here that include, for example, inbound messages and notification messages, and they don't overlap. They are different forms of messages in the description. Was the patent examiner applying email-based prior art against these claims? The examiner actually did in the parent applications provide email-based prior art, and in fact during that discussed, and I can provide the A site, Your Honor, that email was not disclosed with respect, and there was no acquiescence by the examiner, but the examiner said email was not disclosed with respect to the messages in this disclosure, only with respect to notification messages was the statement in the file history, and we have that in our briefing, Your Honor. Moreover, I mean I think what's forgotten is kind of what goes to the history here that's quite important, and we have that image on Respondent's Brief 14 of the separation of assets here that transpired. The assets here were separated by UMS and Acacia versus AMT, who later added to this case, and J2 Global. Why is that? Because if you look at that separation of assets that is on Respondent's Brief, page 14, the statements that have been made to the Central District of California about these assets and the claim. Are we moving over to attorney's fees now? Are we doing claim construction right now? No. I apologize, Your Honor. No. The extrinsic evidence in the statements by counsel was before these assets were litigated by UMS was in concert with what these messages are on an incoming telephone line. They argued in fact that- Those claims actually recited on a telephone line, right? Some of the claims did recite on a telephone line. The 321 patent, which actually was separated, the bottom left of what's in Respondent, actually does not recite on a telephone line. And more importantly, in the 2005 litigation, counsel for J2, now AMT subsidiary, said the patent was, the description was lexicographical and actually limited to audio, facts, and data transfers. This is for message signal, right? No. This actually was for the word document at the time, dealing with the 321 patent. And in the specification, the word document, as it exists in what is for using the 074 patent, is used interchangeably, Your Honor, between message and file, quite frankly, in the specification. What if the specification here, maybe 25 times, said, a message can be a facsimile message, a phone call, and a data message? And it just said it like that. Would that, in your mind, be enough? Can you repeat the question, Your Honor? Sorry. A message can be a fax message, a phone call, or a data message. And it just kept saying that over and over again for 24 times. Would that, in your mind, be enough to read and interpret the word message and the claim as being restricted to those three things? I can't answer that in the abstract because it may not be enough. I think it's a, again, given Columbia, given Phillips, we have to look at the entire context. And here we have the problem of the invention that was being solved, that we couldn't connect a user with a telephone line of communication, and the problems with facsimiles, with voicemails, with data transfers, and that problem then being resolved, and the conversion process. I guess to what extent should an articulated purpose of goal be incorporated into the claim language? I think that's another question, but my first question, I guess you're saying you can't answer it because it depends on context. But if that's the only context, I guess it sounds like maybe that would be going too far to read the word message that particular way. I guess stated differently, I would say this court has case law, and I wouldn't deviate, obviously, from that precedent, that just because something has only one embodiment and a sole embodiment doesn't lead one to necessarily say the claim should be limited to that sole embodiment. I would word it that way, Your Honor. And your question seems to suggest that. But that's not what we have here. We have what we have in Trustees of Columbia, GP&E, ruckus, and we have an explanation of the problem and the solution through columns of patents, including in the new matter, as Your Honor noted in 97, if you want to include that new matter from 23. And much like in Trustees of Columbia, that new matter is perhaps in column 23 at best confusing and perhaps referring to the storage of notification messages. It's unclear because the troika, as you use the term, is mentioned over 17 times in this patent. And even in that context around column 23, or even in column 4, where it does differentiate between data message and e-mail messages, right after the troika is handled in terms of what is described in column 4, only those three items, and e-mail messages and the problems of e-mail messages are not described there, only the problems of the troika. Can I move away from troika? That sounds so negative. How about Trinity? The trio? The three items that are described at length in this patent. And then when dealing with the conversion process, which is ultimately important about what you're receiving over an incoming call on this system, because of the problems of hooking up a user, it is then, after we deal with the conversion, and this patent has columns about the conversion, right, especially about a fax, but also about a voicemail and about a data transfer. It doesn't have anything about a conversion about e-mail for the reasons you noted. You wouldn't need to convert an e-mail. It would already be available in HTML and already be processed. And as the district court found, there's no reason to address what the problems were here for a message if that message were to include inbound e-mail messages. But the defendants are now practicing this version of the invention? Well, what I would say, the answer to that is we're not practicing the invention. No, I understand. But the e-mail, collecting up the e-mails into a central server and then sending a notification e-mail. I think the notion that really the appellants would like to capture is the 321 patent, for example, that was canceled in re-exam was originally asserted back in 2005 by parent J2, which is a broad notion of I have a central repository, a unified messaging system, that stores e-mail, voicemail, fax, and I then deliver that message. Well, that was already, this patent itself already tells you in column 3, with the other mention of e-mail, that those systems already existed. And I would suggest to you that one of the reasons the applicant and Charles Bobo, the inventor, converted his system after doing a prior art search that is part of the record and getting those results, is knowing that these systems, such as the ones to Micholi and Boas, that are described in column 3 of the 0748308, had to change and have something that was patentable, which leads to this system of dealing with the three items, converting them, and providing notification messages. Can I move you quickly to the attorney's fees question? It's a little peculiar to grant fees for the costs of handling motions where your side lost those motions, right? You filed certain sanctions motions and they responded and the judge below ruled against you and then nevertheless said that they have to pay your attorney's fees for asserting those motions. It's a little confusing. And could you explain why that was a permissible decision when it appears at one point, she says, UMS really needed to come forward with the standing issue and didn't in the motions papers, but in fact it sounds like they did identify or propose a willingness to add AMT as a party to the case. I can answer that, Your Honor. First, I'd like to disabuse the notion that they ever offered to add AMT to the party of the case. In the briefing, they did everything possible to ensure that AMT was not added as a party to the case. They just noted that if there was a standing issue, that it can be cured by adding AMT. So there was no offer by them. It was just a notation that there's a potential for cure. After efforts in that briefing to make sure AMT was not a case, not a party. As to the motions, we didn't have any discovery in the case. The parties agreed not to have discovery in the case until after the Markman hearing. At the Markman hearing, we were surprised to hear UMS, who was the only party in the case, say we're not in privity. We're not bound. I was raising those prior statements in district court because if J2 or AMT, we would potentially have judicial estoppel issues. We also just have the party making inconsistent statements. We had a vociferous argument during Markman that they're not a party. They're not here. We're a different party. It was only through this briefing process, which that briefing was structured as an unforceability, not structured as a standing item based on the fact that really the parties are not, the owner is not here, that it became uncovered that there was a standing issue in the case and not all rights. The exclusive licensee did not have all rights, that was UMS, and had to get added. The Markman order didn't consider, even though this happened in the interim. We had Markman hearing. We had these motions. The motions were denied. I guess I'm wondering, sometimes there are standing-related motions that occur, and then ultimately the plaintiff recognizes or the judge instructs that there's another party that's a necessary party and gives them the room to add that other party as a co-plaintiff, and then that's just motions practice. Now, why did what happened here? Litigation is oftentimes an educational process where you learn about issues that need to get prepared. Why wasn't that what happened here? I would reframe the issue, and what the judge learned through the 285 process as we filed the exception, is that actions of what UMS and J2 AMT need to do need to be deterred under Octane. It's not the motions. In fact, as we argue, we should get fees broader than the motions, as she found in her order that their activity had to be based on lack of candor and transparency, in the sense that they brought this case, arguing no privity, no privity. We have, and it's in all the record with respect to the statements in Central District of California, and like I said, the separation of assets, that only became clear to the court after we went through this case in the 285 motion, thinking about what happened through the Markman process. Although she granted fees solely for those motions and the standing and bringing AMT, that's why we come forward and say, really, these people knew from the inception of the case, and it was motivated, as she found, by the lack of candor and transparency for them to not add AMT. They opposed those motions, both of them that were denied, strenuously and vigorously saying that AMT shouldn't be added, that they have the rights to proceed. It's at that point in the 285, when we have all this information, that the district court can see this and see that under Octane, this case does stand out. They knew AMT should have been a party to this case, and there was a litigation strategy that was enacted based on lack of candor and transparency, and just like Octane says from the Supreme Court, we should be deterring others, other plaintiffs, from doing the same and manipulating. Those statements made in the prior litigation, if they had been readily available and they weren't able to argue lack of privity and that they're not a party here, would have been ultimately damning to their positions with respect to message and other terms that are not here on appeal because of what they said in district court. And so this was a cognizant plan by UMS and J2, and she discovered that at the 285 process. Counsel, your time has expired, and we'll hear rebuttal from Mr. Greenspoon. Thank you, Your Honors. Thank you, Your Honor. Your Honors, unless there are questions, I don't think I heard any specific articulated argument on the cross appeal. Just in case there was one, I'll just make one point on the cross appeal and then move on to reply on the main appeal, and that is that the theory of the cross appeal, that there is sanctionable conduct for the whole case, is that there was a plan, I think you just heard, to conceal the involvement of AMT or conceal the involvement of parent patent in prior litigation. I would just submit to Your Honors that it's a litigation impossibility in the context of a hard-fought patent case for any plaintiff, any party, any patentee to conceal the involvement of a family in the patent in prior litigation. So moving back to a question, Your Honor, Judge Chen, that you asked, I'm not sure if you got a good answer from my friend here, but Your Honor, you asked, what if the patent, the specification said that the message is or can be a fax message, a phone call, or a data message, and it said it 24 times? What would that mean in terms of our claim construction law? I think it means virtually nothing in the sense that it's a preferred embodiment statement and no matter how pervasively a preferred embodiment is characterized, that doesn't necessarily mean that you import features of the preferred embodiment into the claims. And that question is actually answered explicitly by the Thorner case, perhaps by the unwired planet case. One or both of those address that exact scenario and say that even exclusive usage in a certain sense won't justify adding this feature as a limitation. One comment on the Columbia case cited by my friend here, the Columbia University case was a wholly distinct situation. It involved explicit lexicography, explicit lexicography. In fact, the terminology was byte sequence feature, and the lexicography said that had to be a machine code extraction rather than a file resource. That's not our case here today, obviously, but it was lexicography where my friend here is not even arguing lexicography in this case. In all the briefing, in all the argument you just heard. Well, they're arguing multiple things. They're talking about the repetitive nature of the trinity of messages, and it doesn't discuss them necessarily in a can-be kind of a context. And then the summary of the invention talks about how the present invention involves receiving an incoming phone call. And then when you look at the true purpose of the invention, which can be a tool for claim construction, it becomes clearer that, as I was mentioning before, that it feels a bit illogical to collect up emails and then send a notification email to say that you've received emails, at least in the context of this patent. And everything Your Honor just said, recharacterizing or recasting my friend's argument, falls under the heading of a disavowal argument. My point was that it's not a lexicography argument. And this is actually important. This has meaning in our patent law, because implied disavowal, which is what he's going after, is something that's addressed in the Unwired Planet case. It's addressed in the Voda case, and particularly with respect to present invention statements. And I think my friend, when he makes that argument, he's referring to Column 5. Present invention statements that are equivocal, as they are here, simply don't count as an implied disavowal. And even if they were unequivocal, even if the statement was, the present invention is, name your feature, even those situations confront the Voda case, which we cite in our papers, which says that that gets neutralized if you have broadening intrinsic record disclosure elsewhere. And we do. And I can point to chapter and verse on that in response to any question. But I see my time is expiring. Unless there are any questions, I would simply ask that. Thank you, Mr. Greenspoon. Mr. Tchaikovsky, you wanted to save some time, but ultimately you utilized it, and there's nothing to respond to, essentially, on the cost appeal anyway. So we'll take the case under advisement. Thank you, and good morning, Your Honors.